ORIGINAL
FILED

2012 MAR 14 A II: 40

MARC J. FAGEL (Cal. Bar No. 154425)
MICHAEL S. DICKE (Cal Bar No. 158187)
ROBERT L. MITCHELL (Cal Bar No. 161354)
  mitchellr@sec.gov
ROBERT L. TASHJIAN (Cal Bar No. 191007)
  tashjianr@sec.gov
ROBERT S. LEACH (Cal. Bar No. 196191)
  leachr@sec.gov
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
  schneidere@sec.gov
MICHAEL E. LIFTIK (Cal. Bar No. 232430)
  liftikm@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FRANK MAZZOLA,<br>FELIX INVESTMENTS, LLC, and<br>FACIE LIBRE MANAGEMENT<br>ASSOCIATES, LLC,<br><br>Defendants. | CV 12 1258<br><br>COMPLAINT<br><br>EDL |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.     This action arises out of a series of fraudulent misrepresentations and deceptions by the sponsors of pooled investment funds designed to invest in the securities of popular technology companies that had yet to go public.  Defendants Frank Mazzola, Felix Investments, LLC, and Facie Libre Management Associates, LLC (together, "Defendants") created, marketed, and managed a number of limited liability companies designed to pool investors' funds to invest in pre-IPO

1   companies like Facebook, Inc. ("Facebook"), Twitter, Inc. ("Twitter"), and Zynga Inc. ("Zynga"). In

2   the course of operating these funds, Defendants misled investors about the compensation they earned,

3   engaged in undisclosed self-dealing adverse to the funds and the funds' investors, lied about the

4   amount of stock the funds actually held, and freely misstated material facts about the companies in

5   which the funds were investing to attract potential investors.

6       2.      Through this action the Commission seeks an order enjoining Defendants from future

7   violations of the securities laws, requiring them to disgorge ill-gotten gains with prejudgment interest,

8   and requiring them to pay civil monetary penalties.

9                   **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT**

10      3.      The Commission brings this action under to Sections 20(b), 20(d) and 22(a) of the

11  Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)], Sections 21(d),

12  21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), §§ 78u

13  (e), and 78aa], and Sections 209 and 214 of the Investment Advisers Act of 1940 ("Advisers Act")

14  [15 U.S.C. §§ 80b-9 and 80b-14].

15      4.      This Court has jurisdiction over this action under Sections 20(b), 20(d), and 22(a) of

16  the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27 of the

17  Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209 and 214 of the Advisers Act

18  [15 U.S.C. §§ 80b-9 and 80b-14].

19      5.      Defendants, directly or indirectly, made use of the means or instrumentalities of

20  interstate commerce, or of the mails, or of the facilities of a national securities exchange in

21  connection with the transactions, acts, practices and courses of business alleged herein.

22      6.      Venue in this District is proper under Section 22(a) of the Securities Act [15 U.S.C.

23  § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act

24  [15 U.S.C. § 80b-14] because Defendants engaged in acts, practices, and courses of business in this

25  District that violate the Securities Act, the Exchange Act, and the Advisers Act and also because

26  defendants transacted business in this District. Defendants' funds were specifically designed to

27  purchase securities of three pre-IPO companies located in this District:  Facebook, which has its

28  headquarters in Menlo Park, California; Twitter, with headquarters in San Francisco; and Zynga, with

1  headquarters in San Francisco.  Several investors in investment funds established by Defendants
2  reside in this District.

3       7.      Assignment to the San Francisco Division is appropriate pursuant to Civil Local
4  Rules 3-2(c) and 3-2(d) because a substantial part of the acts and omissions giving rise to the
5  Commission's claims occurred, among other places, in the Counties of San Francisco and San Mateo.
6  Several investors in investment funds established by Defendants reside in San Francisco, and
7  Defendants' investment funds purchased securities in pre-IPO companies that are located in San
8  Francisco County and San Mateo County.

9                                        **DEFENDANTS**

10      8.      Defendant Frank Mazzola, age 44, resides in Upper Saddle River, New Jersey, and
11  since 2009 has been a principal and owner of Felix Investments, LLC, a registered broker-dealer in
12  New York City.  During the relevant time period, Mazzola and another partner were the sole
13  managing members of Facie Libre Management Associates, LLC.  Mazzola holds Series 7, 8, 63, and
14  65 securities licenses.  Before associating with Felix Investments, LLC, Mazzola worked for three
15  other registered broker-dealers.

16      9.      Defendant Felix Investments, LLC ("Felix") is a registered broker-dealer in New York
17  City.  Felix is 70% owned by Mazzola's uncle, John Bivona.  During the relevant time period,
18  Mazzola owned 10% of Felix; two other partners owned the remaining 20%.  Also during the
19  relevant time period, Felix served as the exclusive placement agent for several funds created and
20  managed by Mazzola.  Felix solicited investors for the funds through its registered representatives,
21  including Mazzola and others, provided the funds' offering materials to potential investors, and
22  effected investors' purchases of interests in the funds.  As of January 2011, Felix had raised at least
23  $56 million for a variety of funds that each separately held stock in Facebook and Twitter, as well as
24  in LinkedIn Corp. and Chegg, Inc.  Of this total, more than $41 million was invested in two funds
25  created to hold Facebook stock.

26      10.     Defendant Facie Libre Management Associates, LLC ("Facie Libre") is a Delaware
27  limited liability company that serves as the investment adviser to two pooled investment vehicles
28  affiliated with Felix:  Facie Libre Associates I, LLC ("FLA I") and Facie Libre Associates II, LLC,

3

1 ("FLA II") (collectively, the "FLA Funds"), both of which engaged primarily in the business of
2 investing in Facebook securities. Facie Libre and Mazzola allocated the Facebook stock into separate
3 series within each fund so that investors held interests in a specific series. During the relevant time
4 period, Mazzola and another partner were the sole managing members of Facie Libre. As of January
5 2011, Facie Libre managed more than $41 million for hundreds of investors in the two funds.

## FACTUAL ALLEGATIONS

7     11.     Starting in mid-2009, a robust secondary marketplace emerged for securities of
8 popular technology companies that had not yet conducted an initial public offering ("IPO"). This
9 marketplace began to attract widespread attention from investors who previously had limited ability
10 to purchase pre-IPO securities. In order to take advantage of the demand for and limited availability
11 of these securities, several investment funds were established to pool investor money and purchase
12 shares of pre-IPO companies, usually from a company's former employees and early investors.
13 These funds were created to acquire securities in a single pre-IPO company.

14     12.     Because pre-IPO companies are privately held, in most circumstances they are not
15 required to report their financial results publicly. Accordingly, investors in the secondary market
16 often make investment decisions without the benefit of information typically relied on by investors in
17 the public markets, including audited financial statements, risk disclosures, and executive
18 compensation information.

19     13.     As described below, Defendants created, marketed, managed, and raised money for
20 several investment funds designed to invest in pre-IPO companies. Defendants established the FLA
21 Funds to invest in the pre-IPO securities of Facebook. *See* Sections I, II, and III, *infra*. Defendants
22 created other investment funds to invest in the pre-IPO securities of Twitter and Zynga. *See* Section
23 IV, *infra*.

24 **I.     Formation of the Facie Libre Investment Funds**

25     14.     Mazzola and Facie Libre formed their first funds, FLA I and FLA II, in
26 November 2009 for the purpose of pooling investor funds to invest in Facebook securities. Mazzola
27 and Facie Libre divided the FLA I and FLA II funds into separate series ("Series"). Mazzola and
28 Facie Libre operated FLA I and FLA II in substantially the same manner: both funds had Series A,

1 | B, C, and D and each of these Series had its own books and records, assets, profits, and losses.

2 | Mazzola and Facie Libre told investors that all Facebook stock purchased on a specific date would be

3 | allocated to its own Series. In late 2009, Mazzola, Felix, and Facie Libre began soliciting investors to

4 | invest in FLA I and FLA II.

5 |   15.   Beginning in January 2010 and continuing through at least December 2010,

6 | Defendants sent to potential investors a letter dated January 7, 2010 that attached an offering

7 | memorandum, a form of operating agreement, and a subscription booklet (collectively, the "Offering

8 | Materials") for FLA I and FLA II. The Offering Materials for the FLA Funds, including the terms

9 | and conditions of the investment, were substantially the same except for information about the type

10 | of investors allowed to invest in each fund.

11 |   16.   Mazzola reviewed and signed the January 7, 2010 investor letter in his capacity as

12 | manager of Facie Libre, which served as the manager of and investment adviser to each fund. He

13 | also reviewed each of the Offering Materials before they were sent to investors. Mazzola sent, and

14 | directed others to send, these Offering Materials to prospective investors.

15 |   17.   According to the January 7, 2010 investor letter, the FLA Funds' investment objective

16 | was to maximize the value of the funds' investments in Facebook securities. Facie Libre was

17 | responsible for purchasing the Facebook securities at prices it believed were advantageous for its

18 | investors.

19 |   18.   Facie Libre had the exclusive authority to manage the investments for FLA I and

20 | FLA II. According to the operating agreements for both funds, Facie Libre was solely responsible

21 | for using investor money to invest, reinvest, and dispose of Facebook securities. It decided the form,

22 | price, timing, and terms of any acquisition of Facebook securities, including whether to buy

23 | Facebook stock directly or whether to invest in other entities that held Facebook stock, and had the

24 | power to determine the value of Facebook securities held by the funds. Facie Libre also had the

25 | power to sell Facebook securities short, and invest in short-term securities, including short-term

26 | obligations of or guaranteed by the United States, certain money market accounts, highly rated

27 | corporate commercial paper, and pooled investment funds that invested in such products. And, Facie

28 | Libre had significant discretion in meeting investor requests for distributions including the ability to

5

1  distribute Facebook securities, cash, or other fund property. Prior to March 2010, the funds' Offering
2  Materials also allowed Facie Libre to make loans to Facebook option holders, use leverage, and use
3  options and futures to hedge the value of the Facebook securities.

4      19.     The offering memoranda for both FLA I and FLA II attached to the January 7, 2010
5  investor letter purported to tell investors how Felix and Facie Libre would be compensated for their
6  work. The memoranda stated that Felix, as the exclusive placement agent for the funds, would
7  "receive a cash fee equal to five percent (5%) of the gross proceeds raised in the Offering." They
8  also stated that Facie Libre would earn five percent of any distributions of profits after investors have
9  received 100% of their entire capital contribution until investors have received 200% of their initial
10 capital contributions; thereafter Facie Libre would earn ten percent (10%) on any distributions. The
11 Offering Materials did not disclose that Facie Libre, Felix, or any of its members, like Mazzola,
12 would earn any other fees or compensation in connection with their work for the funds.

13 **II.     Facebook and the Facie Libre Investment Funds**

14     20.     In order to purchase pre-IPO Facebook shares, Facie Libre had to comply with
15 numerous transfer restrictions, including a right of first refusal, or "ROFR." Accordingly, before
16 Facie Libre could buy Facebook stock, the selling shareholder was required first to send to Facebook
17 a Notice of Proposed Transfer. This notice identified the proposed buyer, the price, and the number
18 of shares involved in the transaction. Facebook then had a specified number of days to decide
19 whether to: (1) exercise the ROFR, meaning it would purchase the stock from the stockholder at the
20 noticed price; (2) assign the ROFR to a third party (a "ROFR partner" – usually a sophisticated
21 venture or private equity firm to whom Facebook had provided detailed financial information), who
22 then would purchase the stock at the noticed price; or (3) allow the proposed transaction to proceed.

23     21.     During 2009, Facie Libre tried unsuccessfully to acquire Facebook shares, as
24 Facebook opted to assign its ROFRs to third parties who subsequently purchased the shares.
25 Thereafter, Mazzola and Facie Libre began to raise the price they were offering to sellers in the hopes
26 that Facebook would be unsuccessful in assigning the ROFR to another party.

27
28

6                                                SEC v. MAZZOLA, ET AL.
                                                 COMPLAINT

1    22.    Facie Libre first succeeded in acquiring Facebook shares in January 2010. By the end
2    of April 2010, FLA I and FLA II had acquired approximately 660,000 shares in twelve separate
3    transactions.

4    23.    Beginning in approximately March 2010, however, Facebook again began assigning
5    its ROFR to third parties when Facie Libre attempted to buy stock. Accordingly, except for the
6    purchase of a small number of Facebook shares in August 2010, Facie Libre was unable to buy more
7    Facebook stock for the remainder of 2010. Facebook only began allowing Facie Libre to purchase
8    more of its stock again in 2011.

9    **III.    Defendants Misrepresented and Omitted Material Facts in Connection with the Offer
        and Sale of Interests in the Facie Libre Investment Funds**
10

11    24.    As discussed in greater detail below, Defendants misrepresented and omitted to
12    disclose to investors material facts concerning the offer and sale of interests in the Facie Libre
13    investment funds. First, from approximately May 2010 to May 2011, Defendants failed to disclose
14    that Facebook had blocked the transfer of shares to Facie Libre in several pending transactions.
15    Instead, during this period Mazzola and Facie Libre accepted investor funds for these shares and
16    allocated interests in FLA I and FLA II as though the funds actually owned the shares. In addition,
17    Defendants arranged for existing Facie Libre investors to sell their fund interests to new investors
18    without disclosing that Facebook had blocked several pending transactions. Nor did Defendants
19    disclose that that investors risked buying into an investment fund that did not own the Facebook
20    shares that it claimed. *See* Section III(A), *infra*.

21    25.    Second, beginning in at least November 2010 Defendants failed to disclose the full
22    amount of compensation that Felix received for its work in connection with the Facie Libre
23    investment funds. Specifically, in November 2010 Felix entered into a written referral fee agreement
24    ("Referral Fee Agreement") with another broker-dealer to share in commissions generated whenever
25    a Facebook shareholder sold stock to a Facie Libre investment fund, or in a transaction in which an
26    existing fund investor sold his fund interest to another investor. As a result of the Referral Fee
27    Agreement, Felix realized substantial compensation beyond the five percent placement fee that
28

7

1  Defendants disclosed in the Offering Materials for the Facie Libre investment funds. *See*

2  Section III(B), *infra*.

3      26.    Third, in or about October 2010, Felix and Mazzola solicited investors by falsely

4  claiming that Facie Libre was about to complete a new purchase of Facebook shares at $66 per share.

5  They lacked a reasonable basis to make these representations.  When Facie Libre failed to acquire

6  new Facebook shares at that price, Felix and Mazzola instead arranged for existing Facie Libre

7  investors to sell their fund interests to the new investors at substantially higher prices. *See*

8  Section III(C), *infra*.

9      27.    And fourth, beginning in at least March 2010, Felix and Mazzola solicited investors by

10  falsely claiming that Facie Libre was "Facebook-approved" and, thus, more likely to obtain pre-IPO

11  Facebook shares than competing funds.  As Felix and Mazzola knew, this was false.  Indeed, a

12  Facebook attorney had previously warned Mazzola against making any such claim. *See*

13  Section III(D), *infra*.

14
15      **A.**    **Facie Libre and Mazzola Failed to Disclose to Investors that Certain Facebook Transactions Were Not Completed**

16      28.    In early 2010, Facie Libre contracted with five Facebook sellers to purchase their

17  stock.  These five proposed transactions involved a total of 133,000 shares of Facebook stock at

18  prices ranging from $33 to $36 per share (the "Disputed Transactions").  In March 2010, Facie Libre

19  used money raised from investors to pay the five Facebook sellers for the shares.

20      29.    In April 2010, Facie Libre sent "Welcome Letters" to investors in the FLA Funds.

21  These letters stated, among other things, how many shares of Facebook stock each of the Series in the

22  FLA Funds owned.  The 133,000 shares under contract in the five Disputed Transactions were

23  included among the shares described in the letters.  Mazzola reviewed and signed the letters before

24  Facie Libre sent them to investors.

25      30.    In May 2010, Facebook notified Mazzola and Facie Libre that it would not transfer

26  ownership of the 133,000 shares in the Disputed Transactions to FLA I and FLA II.  According to

27  Facebook, one of the preconditions to the closing of the Disputed Transactions was not satisfied.

28

31. In June 2010, Facebook, Facie Libre, and Mazzola began discussing a tentative resolution to the Disputed Transactions. In the tentative resolution, Facebook expressed a willingness to agree to transfer ownership of the shares in the Disputed Transactions if Facie Libre agreed to certain conditions, including entering into a standstill agreement which would prohibit FLA I or FLA II from buying any more Facebook stock for one year or until a Facebook IPO. Facie Libre and Facebook did not finalize the tentative resolution, but instead continued to negotiate the standstill and the transfer of these shares well into 2011.

32. Facebook has continued to refuse to transfer ownership of the shares in the largest Disputed Transaction, involving 75,000 shares at a price of $33 per share. Indeed, the selling shareholder in this Disputed Transaction returned the money that FLA I and FLA II had paid him for his shares in 2011.

33. From at least May 2010 to May 2011, FLA I and FLA II did not own all of the Facebook shares that Mazzola and Facie Libre told investors the FLA Funds owned. Because Mazzola and Facie Libre already had allocated the shares in the Disputed Transactions into certain of the FLA Funds' Series, the Disputed Transactions created holes in the balance sheets for those Series, as well as in the balance sheet for each fund. At the time that Mazzola and Facie Libre sent the "Welcome Letter" to investors in April 2010, the shares at issue in the Disputed Transactions comprised approximately 17% of the total shares purportedly acquired by FLA I and FLA II. In the case of Series C of FLA II, the shares at issue in the Disputed Transactions represented all of the Facebook stock that Mazzola and Facie Libre had allocated to that Series.

34. Mazzola knew that Facebook had refused to transfer ownership of the shares involved in the Disputed Transactions since May 2010. He participated in several e-mail communications between Facebook and Facie Libre and their attorneys concerning the proposed resolution, including the standstill agreement, and the subsequent failure to finalize it.

35. From at least May 2010 through June 2011, however, neither Mazzola nor Facie Libre told existing investors in FLA I or FLA II that Facebook had refused to transfer ownership of certain shares in the funds. Nor did Mazzola or Facie Libre tell new investors about the Disputed

SEC V. MAZZOLA, ET AL.
COMPLAINT

1 | Transactions or that Facie Libre was negotiating with Facebook an agreement not to buy any more of
2 | its stock until an IPO.

3 |      36.    Facie Libre and Mazzola thus knew, or were reckless in not knowing, that FLA I and
4 | FLA II materially misrepresented the number of Facebook shares owned by the FLA Funds to
5 | investors in the funds. Facie Libre and Mazzola also knew, or were reckless in not knowing, that
6 | FLA I and FLA II failed to disclose material information concerning the Disputed Transactions to
7 | investors in the FLA Funds.

8 |      37.    As discussed above, Facie Libre was unable to purchase additional Facebook stock
9 | during the second half of 2010. Accordingly, to keep up with demand, in December 2010 Defendants
10 | began selling existing interests in FLA I and FLA II to new investors in transactions referred to as
11 | "lateral transfers." Felix raised at least $11 million from investors in connection with these lateral
12 | transfers.

13 |      38.    During November 2010 and January 2011, Facie Libre sold interests via lateral
14 | transfers in FLA I Series B and C and FLA II Series B, C and D, all of which had been allocated
15 | shares that were part of the Disputed Transactions. Strikingly, investors who purchased shares in
16 | FLA II Series C through a lateral transfer bought interests in a fund that held no Facebook shares.

17 |      39.    Because the FLA Funds did not actually own all the Facebook shares that Defendants
18 | had allocated into each Series, the lateral transfers exposed the new investors to a material risk that
19 | they were buying into a fund that did not own the assets it claimed. Facie Libre and Mazzola knew,
20 | or were reckless in not knowing, that FLA I and FLA II Offering Materials and the lateral transfer
21 | agreements failed to disclose this material risk associated with purchasing interests in the FLA Funds
22 | to new investors.

23 |      40.    Through the lateral transfers, several existing investors in the FLA Funds were able to
24 | realize profits on their Facie Libre investments at the expense of the new investors in the funds.
25 | Among the investors who were advantaged by the lateral transfers was Felix's majority owner and
26 | Mazzola's uncle, John Bivona, who owned interests in a Series affected by the Disputed
27 | Transactions. Facie Libre redeemed Bivona's interests by selling them to new investors in a lateral
28 | transfer. Defendants did not disclose this material conflict of interest to the new investors.

10

1

**B.**  **Facie Libre and Mazzola Failed to Disclose Secret Fees Earned Through Felix's Referral Fee Arrangement**

2    41.    As discussed above, the FLA Funds' operating agreements stated that Felix would act
3  as the exclusive placement agent for the sale of interests in the funds and would receive five percent
4  of the gross proceeds raised in the offering.  Beyond this disclosed fee, however, Mazzola and Felix
5  earned secret profits on the sale of Facebook stock to the funds, and, in several cases, on the resale of
6  existing fund interests to new investors.  This arrangement, while highly profitable for Mazzola and
7  Felix, was detrimental to the funds and to investors.

8    42.    In late November 2010, Felix entered into a written Referral Fee Arrangement with
9  another broker-dealer to share in the commissions generated when a Facebook shareholder sold stock
10  to one of the FLA Funds.  The agreement also authorized Felix to share in the commissions generated
11  when an existing FLA Fund investor sold his interest in the LLC to a new investor in a lateral
12  transfer.

13    43.    In order to facilitate these transactions, Felix employed a registered representative of
14  the other broker-dealer who worked to locate Facebook stock for the FLA Funds to purchase.
15  Although purportedly supervised by the other broker-dealer, this representative was physically
16  located in Felix's offices, was paid a salary by Felix, was given job responsibilities by Felix, and used
17  a Felix e-mail address.  Accordingly, this arrangement was nothing more than a secret way to route
18  the commissions back to Felix, but make it appear as though an independent entity was brokering the
19  sales transactions.  Mazzola was aware of the Referral Fee Arrangement since its inception.

20    44.    Under the terms of the Referral Fee Arrangement, the broker-dealer would return to
21  Felix 87.5% of the commissions paid by Facebook sellers or by existing FLA I or FLA II investors
22  who had decided to sell their interest in the funds.  Through approximately May 2011, the broker-
23  dealer earned over $1.1 million under the Referral Fee Arrangement for Facebook-related
24  transactions, the majority of which the broker-dealer rerouted to Felix pursuant the terms of their
25  agreement.  Of this total, approximately $825,000 related to three transactions that closed in early
26  2011, in which the Facie Libre investment funds purchased new Facebook stock.  Another
27  approximately $325,000 related to nineteen transactions that closed between December 2010 through
28

1   January 2011, in which Defendants arranged for an existing investor to sell his interest in the funds to

2   a new investor.  Mazzola received a portion of the commissions paid to Felix.

3        45.    Neither Mazzola nor Facie Libre disclosed the Referral Fee Arrangement to the

4   investors in FLA I or FLA II.  The FLA Funds' Offering Materials did not disclose that Felix would

5   receive a portion of the purchase paid by the funds for the Facebook stock in the form of a

6   commission charged to the selling Facebook shareholder.  Facie Libre and Mazzola knew, or were

7   reckless in not knowing, that that the Offering Materials misrepresented and omitted material facts

8   about how much Felix would earn in connection with obtaining stock for the funds and for arranging

9   lateral transfers.

10       46.    Facie Libre and Mazzola also concealed from investors the Referral Fee Arrangement

11  in agreements governing lateral transfers.  For example, in a lateral transfer agreement dated January

12  4, 2011, both the selling investor and the purchasing investor agreed that the purchasing investor

13  would pay to Felix a five percent placement fee and the selling investor would pay a commission to

14  the other broker-dealer.  Included in this document is a schedule setting out the amounts paid to each

15  entity under this agreement.  Neither the lateral transfer agreement nor the attached schedule

16  disclosed that Felix would be paid 87.5% of the commission paid to the broker-dealer.  Mazzola

17  reviewed and signed these lateral transfer agreements in his role as the Manager of Facie Libre.  Both

18  Mazzola and Facie Libre knew, or were reckless in not knowing, that these lateral transfer

19  agreements misrepresented the amount of money Felix was earning in connection with these

20  transactions.

21       47.    Mazzola's and Facie Libre's undisclosed self-dealing harmed investors.  Investors in

22  the FLA Funds were directly affected by the Referral Fee Arrangement because it increased the price

23  that the FLA Funds paid for Facebook shares.  Mazzola, who was responsible for approving the price

24  at which the FLA Funds would buy Facebook stock, directed Felix's broker employee to add the

25  entire commission into the price the funds paid for Facebook stock.

26       48.    The Referral Fee Arrangement also created a conflict for Mazzola and Facie Libre and

27  caused them to act adversely to FLA I, FLA II, and the funds' investors.  For example, the Referral

28  Fee Arrangement created an incentive for Felix to negotiate a higher price for shares of Facebook

1  stock: the higher the price, the greater the commissions – and in turn, the amount paid to Felix and

2  Mazzola. A reasonable investor, of course, would have preferred that the funds pay the lowest price

3  possible for Facebook stock.

4      49.      The fees charged by Felix were an important factor in investors' analysis to invest in

5  the FLA Funds. Several investors asked Mazzola questions about Felix's fees. Mazzola repeatedly

6  compared Felix's fees to other funds in the industry and claimed his were more competitive. Some

7  investors negotiated Felix's disclosed five percent fee downward because they thought the fees were

8  too high. Mazzola and Facie Libre's undisclosed self-dealing thus affected investors' ability to gauge

9  whether the fees charged by Felix were reasonable and to assess the economic value of their

10  investments.

11      C.      **Felix and Mazzola Falsely Stated They Possessed Facebook Stock at $66 Per
               Share**

12

13      50.      On or around October 3, 2010, Mazzola, using his Felix e-mail account and Felix

14  signature block, e-mailed several potential investors claiming that the FLA Funds were about to close

15  on Facebook stock at $66 per share, and solicited them to invest in the FLA Funds. He added that

16  interests in the fund would be sold on a first come, first served basis (*i.e.*, if the investors did not act

17  immediately, they may not be able to buy into the fund based on that price of the underlying

18  securities). Mazzola told at least one investor in writing that the "shares had cleared the right of first

19  refusal" and that the "closing is not in question." He told other potential investors that they should

20  disregard other investment opportunities so they could participate in this deal. Several investors

21  wired money to Felix to participate in the offering of interests in the funds. After one investor

22  specifically questioned Mazzola about the price at which the fund was acquiring Facebook stock,

23  Mazzola told him he was "protected at [ ]$66!" Mazzola's e-mails created the impression that the

24  Facie Libre investment funds actually had acquired the stock at the $66 price.

25      51.      Mazzola's and Felix's solicitations were false and misleading. Although Mazzola and

26  Felix had engaged in preliminary negotiations in October 2010 with a potential Facebook seller at a

27  potential price of $66 per share, the seller did not provide notice to Facebook of his intention to sell –

28

SEC v. MAZZOLA, ET AL.
COMPLAINT

1 the very first step in the ROFR process – until October 28, 2010. Facebook ultimately assigned its
2 ROFR on this transaction to a third party and Facie Libre was not able to acquire any stock at $66.

3     52.    Rather than disclose the failed purchase to investors, Felix and Mazzola engaged in a
4 bait-and-switch. After luring investors in with the promise of $66 stock, Felix and Mazzola then
5 arranged for current Facie Libre investment fund investors to sell their LLC interests to new investors
6 at prices that valued the underlying Facebook stock at $68.10 per share (including the investor
7 Mazzola told was "protected at [ ] $66").

8     53.    Felix and Mazzola arranged other lateral transfers at even higher prices. For example,
9 the first investor to wire his money to Facie Libre after the October 3, 2010 solicitation ultimately
10 was sold his LLC interests at a price that valued the underlying Facebook stock at $115 per share –
11 almost double the $66 price Felix advertised.

12     54.    Mazzola and Felix knew or were reckless in not knowing that the solicitations
13 concerning the $66 stock were false and misleading. They knew that the Facie Libre investment
14 funds had not purchased, nor were about to purchase, Facebook stock at $66 per share. They knew
15 that the potential seller with whom Facie Libre was negotiating had not submitted a Notice of
16 Proposed Transfer to Facebook. They also knew, or were reckless in not knowing, that Facebook
17 was unlikely to approve any more sales to Facie Libre because since March 2010 Facebook
18 consistently had been assigning its ROFR to third parties when Facie Libre attempted to buy stock,
19 and was negotiating with Facie Libre for an agreement that would prohibit Facie Libre from buying
20 more pre-IPO Facebook stock. Mazzola is responsible for these material misstatements and
21 omissions because he wrote and distributed the false and misleading solicitations in his capacity as a
22 principal of Felix.

23     **D.    Felix and Mazzola Falsely Told Potential Investors Felix Was Facebook-Approved**
24

25     55.    On or around March 30, 2010, Mazzola e-mailed several potential investors, using his
26 Felix e-mail account and Felix signature block, to compare Facie Libre's Facebook funds to other
27 Facebook funds that had arisen in the marketplace. Mazzola claimed his fees were lower than his
28 competitors and stressed that the other funds would "never be approved by [F]acebook as an

1 investor" and that his funds were "already an approved investor with [F]acebook . . . . Whose client
2 would you rather be?"

3      56.    This statement was false and misleading. Two weeks earlier, a Facebook attorney had
4 e-mailed Mazzola to ask him to stop using anyone at Facebook as a reference in his fundraising
5 efforts. The lawyer stressed that it was "very important that [Mazzola] avoid giving the impression to
6 any of [his] investors or potential investors that Felix or Facie Libre is somehow 'Facebook-
7 approved,' as that is certainly not the case."

8      57.    Mazzola's statement created the false impression that Felix and Facie Libre had a
9 good working relationship with Facebook, and thus were more likely to succeed in buying Facebook
10 stock. And, as discussed above, Mazzola never informed investors about the later developments in
11 Facie Libre's relationship with Facebook including the fact that Facebook consistently began
12 assigning its ROFR to its ROFR partners when Facie Libre attempted to buy its stock and that
13 Facebook wanted Facie Libre to enter into an agreement prohibiting it from buying any more stock.

14      58.    Mazzola and Felix knew or were reckless in not knowing that stating that the
15 FLA Funds were Facebook-approved was false and misleading. They knew that Facebook, through
16 an in-house lawyer, had specifically told Felix and Mazzola that the FLA Funds were not Facebook-
17 approved. Mazzola is responsible for these misstatements and omissions because he wrote and
18 distributed the materially false and misleading solicitations in his capacity as a principal of Felix.

19 **IV.**    **Felix and Mazzola Misrepresentations and Omissions Concerning Twitter and Zynga**

20      59.    Mazzola formed funds to acquire interests in other pre-IPO companies and Felix and
21 Mazzola made additional false and misleading statements in marketing those funds. Specifically,
22 Mazzola created a fund to invest in Zynga securities, and falsely led an investor to believe that the
23 fund was invested in Zynga stock even though it had failed to acquire any such stock. In addition,
24 Mazzola and Felix solicited investors for a fund to invest in Twitter securities by making false claims
25 about Twitter's expected financial results.

26      **A.**    **Mazzola Falsely Represented That a Felix Fund Had Purchased Zynga Stock**

27      60.    In or around May 2010, Mazzola solicited potential investors for his Zynga fund by
28 claiming in writing that a Felix-sponsored fund had "an opportunity to purchase another $1 million of

1  Zynga at the last offering price of $10.50 . . . ." At the time, however, Felix had not previously
2  brokered a Zynga transaction, and no Felix-sponsored fund owned any Zynga securities. Mazzola
3  and Felix knew or were reckless in not knowing that this e-mail was false and misleading.

4      61.    On or around May 13, 2010, Mazzola learned that Zynga was concerned about the
5  transaction because the seller was a current employee and may have had access to inside information
6  to which the Felix fund was not privy. Unaware of Zynga's concerns, an investor on or around
7  May 17, 2010 wired to Felix $150,000 to purchase interests in the Zynga fund believing the fund was
8  about to acquire Zynga stock at $10.50 per share. This investor made clear in several e-mails that he
9  wanted to purchase interests in a Zynga fund only if the fund could acquire the stock at the $10.50
10  price. For the rest of May 2010, Felix attempted to negotiate the transaction with Zynga. However,
11  on or around June 4, 2010, Zynga informed Felix's counsel that it would not complete the transfer of
12  shares to Felix's Zynga fund. At that time, Mazzola knew that Zynga was not going to transfer the
13  shares.

14      62.    On or around September 22, 2010, the investor in the Zynga fund asked Mazzola
15  when he could sell his interests in the Zynga fund. Rather than tell this investor that Zynga had never
16  allowed the fund to buy Zynga stock, Mazzola responded: "I believe another two months," thereby
17  creating the impression that the fund actually had purchased Zynga stock.

18      63.    In or around December 2010, the same investor asked Mazzola about selling his
19  Zynga fund interests to get into another investment fund. Days later, the investor asked: "How much
20  could you get me for [the Zynga-fund investment]? Maybe we would sell that and go into [another
21  pre-IPO company fund]."

22      64.    This investor continued to believe he was invested in a Zynga fund until March 2011
23  when he learned the transaction never closed. The investor lost the opportunity to invest that money
24  elsewhere. Instead, his money sat in Felix's escrow account for nine months while Felix and
25  Mazzola allowed the investor to believe he was invested in a Zynga fund.

26      65.    Mazzola knew or were reckless in not knowing that stating that the investor could sell
27  his Zynga-fund interests in two months was false and misleading. Mazzola is responsible for these
28

1  misstatements and omissions because he wrote and distributed the materially false and misleading

2  statements in his capacity as a principal of Felix.

3           **B.     Felix and Mazzola Made False Statements About Twitter's Revenue**

4           66.     In February 2010, Mazzola formed two funds designed to invest in Twitter:  Pipio

5  Associates I, LLC and Pipio Associates II, LLC.  Between February and May 2010, Felix and

6  Mazzola raised approximately $5.2 million for these funds.

7           67.     In late 2010, Mazzola and Felix began soliciting potential investors to raise money to

8  acquire additional Twitter stock.  At the time, Twitter had not publicly disclosed its financial results.

9           68.     Several potential investors asked Mazzola for information about Twitter's revenues.

10  For example, in an e-mail sent on or around December 19, 2010, a potential investor in Felix's

11  Twitter only fund asked:  "Is there any sets of rev[enue] out there [for Twitter]?  I heard less than

12  $100 m."  Mazzola, writing from his Felix e-mail account, responded on or around the same day:

13  "$125-$150 mil this year and $300-$400 mil next year!"

14           69.     In another e-mail sent on or around December 19, 2010, a potential investor asked

15  Mazzola if he "could get 2010 [revenue for Twitter]?  Papers still claim $50M. . . .  Seems low."  On

16  or around the same day Mazzola, writing from his Felix e-mail address, responded:  "Trying to

17  confirm it.  I know I am right but want a validation."  He then followed up in separate e-mail on or

18  around December 19, 2010 stating: "Twitter should come in north of $100 million in Revenue this

19  year.  The person (second person in the know who has validated the rev numbers for this year) I

20  spoke with who would know would not give me a firmer number.  When I said $150 million he

21  responded with north of $100 million."

22           70.     In another e-mail chain with a different potential investor in the Twitter fund regarding

23  Twitter revenue projections, Mazzola, writing from his Felix e-mail address, wrote on or around

24  December 20, 2010: "we have several senior Twitter execs as clients and we have a very good

25  comfort level that the rev for 2010 is north of $100 million."

26           71.     On or around December 26, 2010, Mazzola, writing from his Felix e-mail address, told

27  yet another potential investor that "We have been told they [Twitter] will come in north of $100 mil

28  in rev this year and that is the guidance we have been giving."

72. All of these statements were materially false and misleading. Mazzola and Felix had no information to support their "north of $100 million" projection. Mazzola and Felix had no senior Twitter executives as clients. Twitter even informed Mazzola and Felix in January 2011 that Felix's revenue figures were wrong "by a wide margin," but Felix never corrected the information.

73. Mazzola and Felix knew or were reckless in not knowing that the Twitter revenue projections were false and misleading. Mazzola is responsible for these misstatements and omissions because he wrote and distributed the false and misleading statements in his capacity as a principal of Felix.

74. Ultimately, Twitter refused to allow additional stock to be sold to Felix's Twitter fund because it was concerned, among other things, about Felix's material misrepresentations regarding Twitter's revenue. However, shortly after Mazzola misrepresented Twitter's revenue, Felix and Mazzola sold approximately $700,000 of interests in the Twitter funds through lateral transfers to five new investors, including at least one to whom Mazzola had provided false information about Twitter's expected revenue.

## FIRST CLAIM FOR RELIEF
### *Fraud in the Purchase or Sale of Securities*
*(Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Against All Defendants)*

75. The Commission realleges and incorporates by reference Paragraph Nos. 1 through 74, above.

76. By engaging in the conduct described above, Felix, Facie Libre, and Mazzola, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

77. By reason of the foregoing, Felix, Facie Libre, and Mazzola have violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

1

**SECOND CLAIM FOR RELIEF**
*Fraud in the Offer or Sale of Securities*

2          *(Violation of Section 17(a) of the Securities Act Against All Defendants)*

3          78.     The Commission realleges and incorporates by reference Paragraph Nos. 1 through 74,

4     above.

5          79.     By engaging in the acts and conduct alleged above, Felix, Facie Libre, and Mazzola,

6     directly or indirectly, in the offer or sale of securities, by use of the means or instruments of

7     transportation or communication in interstate commerce or by use of the mails: (a) with scienter

8     employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of

9     untrue statements of material fact or by omitting to state a material fact necessary in order to make

10    statements made, in the light of the circumstances under which they were made, not misleading; and

11    (c) engaged in transactions, practices, or courses of business which operated or would operate as a

12    fraud or deceit upon the purchasers.

13         80.     By reason of the foregoing, Felix, Facie Libre, and Mazzola have violated and, unless

14    restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C.

15    § 77q(a)].

16

**THIRD CLAIM FOR RELIEF**
*Fraud by Investment Advisers on Investors in Pooled Investment Vehicles*

17    *(Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder*
*Against Facie Libre and Mazzola)*

18

19         81.     The Commission realleges and incorporates by reference Paragraph Nos. 1 through 74,

20    above.

21         82.     The investment funds formed by Felix and Mazzola, including FLA I, FLA II, Pipio

22    Associates I, LLC, Pipio Associates II, LLC, and the Zynga funds described above, are pooled

23    investment vehicles, as defined in Rule 206(4)-8 under the Advisers Act, engaged primarily in the

24    business of investing, directly or indirectly, in securities of pre-IPO companies.

25         83.     By engaging in the acts and conduct alleged above, Facie Libre and Mazzola, directly

26    or indirectly, through use of the means or instruments of transportation or communication in

27    interstate commerce or of the mails, and while engaged in the business of advising others for

28    compensation as to the advisability of investing in, purchasing, or selling securities: (a) made untrue

19

1 | statements of a material fact or omitted to state a material fact necessary to make the statements

2 | made, in the light of the circumstances under which they were made, not misleading, to investors or

3 | prospective investors in a pooled investment vehicle; and (b) engaged in acts, practices, or courses of

4 | business that were fraudulent, deceptive, or manipulative with respect to investors or prospective

5 | investors in a pooled investment vehicle.

6 |      84.     By reason of the foregoing, Facie Libre and Mazzola have violated and, unless

7 | restrained and enjoined, will continue to violate Section 206(4) of the Advisers Act and

8 | Rule 206(4)-8 thereunder [15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-8].

9 | **PRAYER FOR RELIEF**

10 |      WHEREFORE, the Commission respectfully requests that this Court:

11 | I.

12 |      Permanently enjoin Felix, Facie Libre, and Mazzola from directly or indirectly violating 17(a)

13 | of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

14 | and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

15 | II.

16 |      Permanently enjoin Facie Libre and Mazzola from directly or indirectly violating

17 | Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R.

18 | § 275.206(4)-8];

19 | III.

20 |      Order Felix, Facie Libre, and Mazzola to disgorge any wrongfully obtained benefits,

21 | including prejudgment interest;

22 | IV.

23 |      Order Felix, Facie Libre, and Mazzola to pay a civil penalty pursuant to Section 20(d)(1) of

24 | the Securities Act [15 U.S.C. § 77t(d)(1)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

25 | § 78u] and order Facie Libre and Mazzola to pay a civil penalty pursuant to Section 209 of the

26 | Advisers Act [15 U.S.C. § 80b-9];

27 |

28 |

V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

VI.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  March 14, 2012                          Respectfully Submitted,

_____

Erin E. Schneider
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION